**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**NETJETS INC., et al.,**

      **Plaintiffs,**                          **Case No. 2:12-cv-00059**
                                                   **Judge Gregory L. Frost**
**v.**                                               **Magistrate Judge Abel**

**INTELLIJET GROUP, LLC,**

      **Defendant.**

**OPINION AND ORDER**

This matter is before the Court on the following filings:

1.     Defendant IntelliJet Group, LLC's ("IntelliJet") motion for summary judgment (ECF Nos. 48, 51), the response in opposition of Plaintiffs NetJets Inc. ("NetJets") and Columbia Insurance Company ("Columbia") (ECF Nos. 62, 64), and IntelliJet's reply memorandum (ECF No. 67);

2.     Plaintiffs' motion for leave to file a sur-reply to Defendant IntelliJet's reply memorandum (ECF No. 69); and

3.     Defendant's "motion in limine" to preclude evidence and testimony relating to the report of Plaintiffs' expert, Anne H. Chasser (ECF Nos. 47, 53), Plaintiffs' response (ECF No. 63), and Defendant's reply (ECF No. 68).

For the reasons that follow, the Court **GRANTS** Plaintiffs' motion for leave to file a sur-reply, **GRANTS IN PART AND DENIES IN PART** the motion to preclude evidence and testimony relating to Plaintiffs' expert, and **GRANTS IN PART AND DENIES IN PART** Defendant's motion for summary judgment.

1

**I.**

**A.**    *NetJets' Business*

Plaintiff NetJets is a private aviation company headquartered in Columbus, Ohio. NetJets' predecessor, Executive Jet Aviation, originated in Columbus in 1964 as a private business jet charter and aircraft management company.  Today, NetJets markets itself as a full service private aviation solution provider, offering among other things fractional ownership of jet aircraft, jet lease management, and jet charter services.  NetJets' most widely known service is fractional jet ownership, which allows for either the purchase or lease of a "share" of an aircraft for a certain number of hours of usage each year.  (For example, an owner of a $1/16^{th}$ share has 50 hours annually for the specific aircraft type for which the share is purchased or leased.) NetJets' fractional ownership clients are therefore able to buy a share of a private jet at a fraction of the cost of owning a whole aircraft.

In addition to fractional aircraft ownership, NetJets offers aircraft leasing through Marquis Jet Partners, Inc. ("Marquis"), a company that NetJets acquired in 2010.  Marquis offers the "Marquis Jet Card," which is a sublease of an aircraft in the NetJets program for a set number of hours.  The Marquis Jet Card program allows customers to access aircraft from NetJets' fleet without having to purchase or lease a fractional share.  Before NetJets bought Marquis in 2010, Marquis was NetJets' largest customer for fractional shares, which Marquis would then resell under its card program.  In addition to the NetJets' fractional share business and the Marquis business, NetJets manages fleet operations internationally through an entity known as NetJets Europe.  Overall, NetJets provides more than 300,000 flights throughout 170 countries for its customers.

B.     *The IntelliJet Software*

In order to help manage its operations, NetJets began in the 1990s to develop its own customized and proprietary software program, which it called "IntelliJet."  NetJets began developing the software internally in 1994.  Approximately six employees worked on the software's development, including the writing of the source code and the software's debugging. This first iteration of the IntelliJet software included modules for contracts and accounts, reservations, flight following, crew management, airport management, billing, and crew communications.  NetJets did not license the IntelliJet software program to any third party. Though there was some interest from third parties to acquire a license to use the software, NetJets chose not to do so in order to maintain a competitive advantage in its business.  From 1995 through 2000, no one other than certain employees of NetJets and NetJets' related companies had access to the IntelliJet software.

In the years following the development of the first version of the IntelliJet software, NetJets' employees worked on improvements and refinements to the software.  NetJets eventually launched an upgraded version of the software, which it dubbed "IntelliJet II."  The latter software program performs the same functions as IntelliJet I, but, according to NetJets, is greatly enhanced to provide additional features for NetJets owners.

According to testimony in the record, approximately 220 employees in NetJets' IT department support the IntelliJet system.  NetJets invests a considerable amount of money to maintain and develop upgrades to the software; the upgrade from "IntelliJet I" to "IntelliJet II," for example, cost NetJets approximately $20 million to implement.  The IntelliJet software has been and continues to be located on servers in Columbus, Ohio.

Under previous versions of the IntelliJet software, NetJets' customers (or "owners" as NetJets calls them) did not have direct access to the IntelliJet software. With IntelliJet II, however, there is now an "owner's portal" that allows owners to access the system from the internet and perform such tasks as changing their preferences or making flight reservations. When owners log into the website, the INTELLIJET name is displayed on the screen. The owner's portal went "live" for NetJets owners in January 2013. While NetJets' owners can now see the INTELLIJET name when they log in to their NetJets' accounts, there is no evidence or testimony to indicate that the INTELLIJET name is displayed to non-NetJets owners who access the NetJets website over the internet.

### C.    *NetJets' Touting of the IntelliJet Software*

NetJets considers the IntelliJet software to be proprietary and a trade secret. NetJets also considers the IntelliJet software to be a vital part of its business and a point of emphasis when discussing NetJets' operation with customers and potential customers. Over the years, NetJets has included discussion of the IntelliJet software's functionality in newsletters to owners and in literature provided to passengers on NetJets' airplanes. NetJets' brochures for both its fractional share business and the Marquis Jet Card business have also mentioned the IntelliJet software. NetJets consistently refers to the software as "IntelliJet®" to show that it has a registered trademark in the software's name.

NetJets also uses IntelliJet in tours of NetJets' facility in Columbus, Ohio given to customers and potential customers. During these tours, NetJets shows off some of the features of the IntelliJet software. NetJets has also offered into evidence several magazine articles about NetJets that have mentioned the IntelliJet software.

### D.    *Defendant IntelliJet Group LLC*

Defendant IntelliJet Group LLC is a Florida limited liability company that has operated under the name "IntelliJet International" since 2005.  IntelliJet International is in the business of providing aircraft brokerage services, helping clients either sell or acquire jet aircraft.  The company deals primarily in Gulfstream, Bombardier, and Dassault jet aircraft ranging in price from $10 million to $60 million.  In recent years, IntelliJet International has also provided aircraft leasing services through a division of the company and has expanded its business into the area of aircraft management.

Gary Spivack is the founder and 50 percent owner of IntelliJet Group.  Spivack testified in his deposition that he was the person who came up with the name "IntelliJet" for his company.  Spivack conducted internet searches in 2005 to ascertain whether the name "IntelliJet" was being used.  Spivack testified that he found "seven or eight different IntelliJet trademarks," including the one held by NetJets.  Spivack did not consider NetJets' registration of the INTELLIJET trademark to be an impediment to his use of "IntelliJet."  Since NetJets' registration was for software and Defendant IntelliJet did not sell software, Spivack saw "absolutely no problem with" using the IntelliJet name for his company.

### E.    *Registration of the Marks at Issue*

In December 1995, NetJets (then known as "Executive Jet, Inc.") filed a federal trademark application for the INTELLIJET mark.  The United States Patent and Trademark Office ("PTO") approved the application and issued Registration Certificate No. 2,025,410 for INTELLIJET in December 1996 for "computer software for managing aircraft leasing and sales."  Nearly six years later, in September 2002, NetJets filed a Combined Declaration of Use and Incontestability with the PTO, informing the PTO that the INTELLIJET mark had been used

5

in commerce for five consecutive years after the date of registration.  The PTO approved the declaration, thereby granting INTELLIJET incontestability status under 15 U.S.C. § 1065.  In 2003, Plaintiff Columbia obtained the INTELLIJET mark from NetJets in connection with its purchase of certain intellectual property.  Columbia owns the INTELLIJET mark, while NetJets is the licensee.[1]

In May 2012, while this litigation was pending, Defendant filed a service mark application with the PTO.  Defendant sought registration of its "IntelliJet International" service mark, which consists of "the word 'INTELLIJET', stylized and in block lettering, with a design of a jet attached to the top of the letter 'J' and connected to the first letter 'I' by a line, and the word 'INTERNATIONAL', stylized and in block lettering, underneath the word 'INTELLIJET.'"  As of the time of the summary judgment briefing in this case, Defendant's service mark application remained pending at the PTO.

### F.    *NetJets Files Suit against IntelliJet*

Plaintiffs commenced this action in January 2012, alleging claims of trademark infringement (Count I) and false designation of origin (Count II) under the Lanham Act, 15 U.S.C. § 1051 et seq.  (Compl., ECF No. 1 at ¶¶ 26-35.)  Plaintiffs' complaint also alleges Ohio law claims for deceptive trade practices under Ohio Rev. Code § 4165 et seq. (Count III) and for common law unfair competition and injury to business reputation (Count IV).  (*Id.* at ¶¶ 36-40.)

Defendant answered and filed a counterclaim.  (ECF Nos. 10 and 11.)  In Count I of an amended counterclaim, Defendant pleaded a claim for cancellation of Plaintiffs' INTELLIJET mark on the basis of abandonment.  (ECF No. 11 at ¶¶ 1-6.)  Defendant also pleaded in Count II

---

[1] In their briefing in opposition to Defendant's motion for summary judgment, Plaintiffs consistently uses "INTELLIJET" (*i.e.*, in all capital letters) when referring to the registered trademark and "IntelliJet" when referring to the software itself.  The Court accordingly does the same in this Opinion and Order.

of the amended counterclaim a claim for unfair competition under Ohio law.  (*Id.* at ¶¶ 7-10.)

This Court later granted Defendant leave to file a second amended counterclaim.  (ECF No. 73.)

Defendant's second amended counterclaim added to Count I a claim for cancellation of

Plaintiffs' mark based on a theory that NetJets' registration was "void *ab initio*" because NetJets

was not using the mark in commerce as of the date that the trademark application claimed first

use of INTELLIJET.  (ECF No. 82 at ¶ 7.)

　　　Defendant IntelliJet has moved for summary judgment on Plaintiffs' claims for trademark

infringement and false designation of origin under the Lanham Act and on Defendant's

counterclaim to cancel Plaintiffs' registration of INTELLIJET.  Defendant's motion also

addresses Plaintiffs' claim of common law trademark infringement contained in Count I of the

complaint along with the Lanham Act claim.

## II.

　　　As an initial matter, the Court addresses Plaintiffs' motion for leave to file a sur-reply to

Defendant's reply in support of summary judgment.  (ECF No. 69.)  Plaintiffs ask the Court for

an opportunity to respond to Defendant's argument, raised for the first time in Defendant's reply,

that Plaintiffs did not assert a claim in this case for common law trademark infringement.  (*Id.*)

Plaintiffs attached their proposed sur-reply to the motion for leave.  (ECF No. 69-1.)

　　　The Court **GRANTS** Plaintiffs' motion for leave to file their sur-reply.  In its motion for

summary judgment, Defendant made a merits-based argument that Plaintiffs lacked common law

trademark rights.  In its Reply, Defendant changed course, suddenly objecting "strenuously" to

Plaintiffs' claim to common law trademark rights on the basis that Plaintiffs did not plead or

otherwise put Defendant on notice that they claimed such rights in this lawsuit.  (Def.'s Reply,

ECF No. 67 at PageID# 3771.)  Accordingly, the Court agrees with Plaintiffs that Defendant

raised a new argument in its reply that it did not raise in its original motion for summary judgment.  The Court therefore grants Plaintiffs' motion for leave and deems the sur-reply attached to Plaintiffs' motion for leave to have been filed in this action.  The Court has also reviewed and considered Plaintiffs' sur-reply in connection with its adjudication of Defendant's motion for summary judgment.

## III.

Before proceeding to the merits of Defendant's motion for summary judgment, the Court must also address Defendant's motion, styled as a "motion in limine," to preclude evidence and testimony relating to the report of Plaintiffs' expert, Anne Chasser.  (ECF Nos. 47, 53.)  Though styled as a motion in limine, which is normally filed nearer to the time of trial, Defendant is ostensibly asking the Court to disregard Chasser's expert report and expert testimony in connection with the decision on Defendant's summary judgment motion.

Chasser is a former Assistant Commissioner of Trademarks for the PTO and has worked in the trademark and branding industry for 35 years.  As an assistant commissioner, Chasser had responsibility over various aspects of trademark operations at the PTO, including policy formation, trademark examination, trademark office practices, and trademark filing systems. Chasser has opined in her expert report that (1) NetJets' INTELLIJET mark is valid and has become incontestable, (2) NetJets has common law trademark rights, and (3) there is a likelihood of confusion as between Defendant's IntelliJet service mark and Plaintiffs' INTELLIJET mark.

Defendant seeks to exclude Chasser's testimony on the basis that she opines on impermissible legal conclusions.  Defendant also contends that the Court should exclude Chasser's opinions because they have no "independent factual basis."  In other words, Defendant

argues that Chasser bases her opinions solely upon the "pre-selected facts and personal opinions" that Plaintiffs' counsel provided her.  (Def.'s Mot., ECF No. 47 at PageID# 1388.)

Fed. R. Evid. 702 governs expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Federal Rule of Evidence 704(a) provides that an expert's opinion "is not objectionable just because it embraces an ultimate issue."  A purported expert's testimony is inadmissible, however, if it offers nothing more than a legal conclusion.  *Woods v. Lecreux*, 110 F.3d 1215, 1220 (6th Cir. 1997); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994).

As to the argument that Chasser is opining on a legal conclusion, the Court agrees with Defendant that an expert is not permitted to opine on the legal issue of whether a trademark is valid.  *See Ideal World Marketing, Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 244 n.2 (E.D.N.Y. 1998) (finding expert opinion that a mark was "suggestive and not descriptive" to be an inadmissible legal opinion); *Kerzner Int'l Ltd., Inc. v. Monarch Casino & Report, Inc.*, No. 3:06-cv-232, 2009 WL 5066908, at *3 (D. Nev. Dec. 14, 2009) (finding expert's opinion going to whether registration was valid to be inadmissible; "[i]t is the role of the Court, not an expert witness, to inform the jury of the law applicable to the case").  Chasser is doing just that in the

portion of her expert report in which she opines that NetJets' INTELLIJET mark is incontestable and that NetJets enjoys common law rights in the trademark.

Notwithstanding the contents of Chasser's report, Plaintiffs deny that Chasser is opining on a legal issue.  Plaintiffs say that Chasser, who is not a lawyer, is opining on factual issues relating to whether there is a likelihood of confusion between NetJets' INTELLIJET mark and Defendant's IntelliJet mark.  (Pls.' Opp'n, ECF No. 63 at PageID# 3025.)  Plaintiffs say nothing of the opinion in Chasser's expert report concerning the incontestability of the INTELLIJET mark or of the opinion concerning NetJets' common law trademark rights.  Plaintiffs appear to concede that an expert cannot opine on the legal issue of a trademark's validity: indeed, they distinguish *Kerzner* on the basis that the expert there sought to opine "in regards to the issuance and validity of a registered mark."  (*Id.* at PageID# 3024.)

In light of the inadmissibility of expert opinion regarding the legal issue of trademark validity, coupled with Plaintiffs' implicit concession that Chasser cannot opine on such an issue, the Court **GRANTS** Plaintiff's "motion in limine" with respect to the opinions on incontestability and common law trademark rights contained in Chasser's expert report.

The Court reaches a different conclusion, however, with regard to Defendant's motion to exclude Chasser's opinion on the likelihood of confusion factors.  Chasser's opinion in this regard is not a legal conclusion.  *See Whirlpool Properties, Inc. v. LG Electronics U.S.A., Inc.*, No. 1:03cv414, 2006 U.S. Dist. LEXIS 1378, at *14 (W.D. Mich. Jan. 10, 2006) (allowing expert testimony on likelihood of confusion because it "would assist the trier of fact").  Defendant nevertheless argues that Chasser's opinion as to likelihood of confusion is inadmissible because it rests on an insufficient factual basis.

It is true that Chasser's opinion is based in large part upon facts of which she was informed. But many of these facts are in the evidentiary record in this case, at least to this (the summary judgment) stage. That Chasser did not consider certain evidentiary materials or conduct independent investigation of certain facts are matters that go to the weight of her testimony, not its admissibility. The Court therefore **DENIES** Plaintiff's motion to the extent it seeks to exclude Chasser's testimony on the "likelihood of confusion" issue.

## IV.

The Court now proceeds to the merits of Defendant IntelliJet's motion for summary judgment. Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will not lie if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The movant has the initial burden of establishing that there is no genuine issue of material fact to try. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co*., 12 F.3d 1382, 1388-89 (6th Cir. 1993). The non-movant must then come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find in its favor. *See Anderson*, 477 U.S. at 252.

Plaintiffs have alleged trademark infringement (under the Lanham Act and common law) against Defendant for Defendant's use of the mark, "IntelliJet." To establish trademark infringement under the Lanham Act, a plaintiff must prove (1) that it owns a valid mark; (2) that the defendant used the mark "in commerce" and without plaintiff's authorization; (3) that the

defendant used the mark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers.  15 U.S.C. § 1114(a).  Plaintiffs have also alleged a Lanham Act claim for false designation of origin, which must contains two elements: (1) the false designation must have a substantial economic effect on interstate commerce and (2) the false designation must create a likelihood of confusion.  *See* 15 U.S.C. § 1125(a); *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998)

The "touchstone of liability" for federal trademark infringement claims brought under 15 U.S.C. § 1114 "is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."  *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr*., 109 F.3d 275, 280 (6th Cir. 1997); *see also Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007).  Likewise, a plaintiff's success on a false designation of origin claim turns on whether the plaintiff can show that the false designation creates a "likelihood of confusion."  *Johnson*, 149 F.3d at 502.  Claims for trademark infringement and false designation of origin under Ohio common law are subject to the same standards as their federal counterparts.  *Mountain Top Beverage Group, Inc. v. Wildlife Brewing N.B., Inc.*, 338 F. Supp. 2d 827, 831 (S.D. Ohio 2004); *see also Daddy's Junky Music Stores*, 109 F.3d at 288.  "Additionally, 'both Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act.'"  *Mountain Top Beverage*, 338 F. Supp. 2d at 831-32 (quoting *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc*., 280 F.3d 619, 626 n.2 (6th Cir. 2002)).

But even before the Court reaches the question of whether there is a likelihood of confusion, the plaintiff must show that it "has actually used the designation at issue *as a trademark*, and that the defendant has also used the same or a similar designation, *as a trademark*." *Rock & Roll Hall of Fame & Museum. Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998) (emphasis in original).  Here, Defendant argues that Plaintiffs have not used "INTELLIJET" as a trademark as a matter of law while Plaintiffs argue that they have.  In other words, the case turns in large part on whether Plaintiffs' registration of the "INTELLIJET" mark is valid.  *See Mountain Top Beverage*, 338 F. Supp. 2d at 832.

### A.  Use in Commerce

Defendant's primary argument is that Plaintiffs do not have enforceable trademark rights in the "INTELLIJET" mark because they do not use the mark in commerce.  Defendant relies on the axiomatic concept that the right to register a mark depends upon the mark's actual use in trade.  *See e.g. Allard Enters., Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 356 (6th Cir. 1998) (noting one of the "bedrock principles" of trademark law is that ownership rights flow from actual use in the market).  Arguing that the summary judgment evidence shows that NetJets' use of "INTELLIJET" is "solely internal," Defendant contends that Plaintiffs have not actually used "INTELLIJET" in commerce as a matter of law, rendering their trademark of "INTELLIJET" invalid.

The Lanham Act contains a definition for "use in commerce":

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this Act, a mark shall be deemed to be in use in commerce—

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.

The parties' briefing treats Plaintiffs' IntelliJet software as a "good."  Because NetJets has never sold the IntelliJet software, never advertised the IntelliJet software, and never marketed the IntelliJet software, Defendant argues that NetJets has not actually used the INTELLIJET mark in trade.  Without actual use in trade, Defendant argues that there can be no trademark.

In support of its argument for summary judgment, Defendant relies heavily on the Federal Circuit's recent decision in *Lens.com v. 1-800 Contacts*, 686 F.3d 1376 (Fed. Cir. 2012).  In *Lens.com*, the issue was the validity of the mark "LENS" for use in connection with "computer software featuring programs used for electronic ordering of contact lenses in the field of opthamology, optometry, and opticianry."  *Id.* at 1378.  A competitor of Lens.com filed a cancellation petition, alleging that Lens.com "fraudulently obtained or alternatively abandoned" the "LENS" mark because Lens.com "never sold or otherwise engaged in the trade of computer software."  *Id.*  The Trademark Trial and Appeal Board ("TTAB") granted summary judgment on the claim of abandonment on the ground that Lens.com's software was "'merely incidental to its retail sale of contact lenses, and is not a 'good in trade,' i.e., 'solicited or purchased in the market place for [its] intrinsic value.'"  *Id.* (quoting *1-800 Contacts, Inc. v. Lens.com,*

Cancellation No. 92,049,925, 2010 TTAB LEXIS 212, *9 (T.T.A.B. May 18, 2010)).  Lens.com appealed to the Federal Circuit, which affirmed the decision of the TTAB.

Just as it is undisputed in this case that NetJets is not in the business of selling software, so too was it uncontested in *Lens.com* that Lens.com does not sell software.  *Id.* at 1380.  Focusing on 15 U.S.C. § 1127's definition of "use in commerce," the Federal Circuit first noted that actual sale of goods is not required to satisfy the "use in commerce" requirement, "provided that the goods are 'transported' in commerce."  *Id.*  The Federal Circuit also noted, however, that not every transport of a good will suffice to establish trademark rights.  Rather, there must be an element of "public awareness of the use" in order to establish ownership rights in a mark.  *Id.* (quoting *Gen. Healthcare Ltd. v. Qashat*, 364 F.3d 332, 337 (1st Cir. 2004) (internal quotations omitted)).

Framing the issue as whether Lens.com's software was a "good" transported in commerce, the Federal Circuit first noted that "an article does not qualify as a good in trade when that article is 'simply the conduit through which [the applicant] renders services,' i.e., is 'the essence or gist of [the applicant's] services.'"  *Id.* (quoting *In re Shareholders Data*, 495 F.2d 1360, 1361 (C.C.P.A. 1974)).  Further, the Federal Circuit noted it to be "well established" that an article is "not likely to be an independent good in trade" when it has no independent value apart from the services rendered.  *Id.* (citing *Shareholders Data*).  While acknowledging that distribution of software over the internet *can* satisfy the "use in commerce" requirement, the Federal Circuit observed that "whether consumers actually associate a mark with *software*, as opposed to other services, is a factual determination that must be conducted on a case-by-case basis."  *Id.* at 1381-82.  The court also listed a number of relevant factors to consider in this determination, including whether the software "(1) is simply the conduit or necessary tool useful

15

only to obtain applicant's services; (2) is so inextricably tied to and associated with the service as to have no viable existence apart therefrom; and (3) is neither sold separately from nor has any independent value apart from the services." *Id.* at 1382. "None of these factors need necessarily be dispositive, but each may shed light on whether an applicant's software is an independent *good* being 'sold or transported in commerce.'" *Id.* (emphasis in original).

Applying the law to the facts of *Lens.com*, the Federal Circuit affirmed the TTAB's determination that "LENS" was not a valid mark because it was not used in commerce within the meaning of the Lanham Act. *Id.* Though acknowledging the fact that the software "facilitates the customers' online order," which is unique to each customer depending on what customers view or purchase, the court nonetheless found that the "LENS" software was not used in commerce in the sense required for a valid trademark. The court held that the software (1) was merely the conduit through which Lens.com rendered its online retail services, (2) was inextricably intertwined with the service that Lens.com provided to its customers, and (3) did not have independent value apart from the online retail services for which Lens.com used it. *Id.*

Defendant urges this Court to follow the Federal Circuit's lead in *Lens.com*. Like the trademark registrant in *Lens.com*, NetJets does not sell the software associated with the challenged trademark. Defendant therefore argues that NetJets' IntelliJet software is merely the "conduit" through which NetJets provides its services to customers. While the software may be proprietary and valuable to NetJets as a tool that provides the company a competitive advantage, Defendant argues that fact is not enough to satisfy the requisite "use in commerce" requirement of the Lanham Act. In Defendant's view, the INTELLIJET mark is associated with software that is nothing more than an internal software program of NetJets. *See also City Nat'l Bank v. OPGI Management GP Inc. v. Gestion OPGI Inc.*, 106 U.S.P.Q. 2d 1668, 1678 (T.T.A.B. 2013)

16

(rejecting trademark of "TREASURYNET" because the proprietary database to which it applied was only for use by the respondent's employees).

Plaintiffs, of course, disagree with the analysis Defendant posits.  Plaintiffs argue that they satisfy the "use in commerce" requirement because (1) NetJets has prominently and continuously displayed the INTELLIJET mark since the time that NetJets developed the software in 1995, (2) the software and its INTELLIJET mark have achieved public recognition, (3) the software has been transported in interstate commerce, and (4) NetJets has licensed the software to third parties.  Citing the broad definition of what is considered "commerce" under the Lanham Act, Plaintiffs identify these factors as proof that NetJets has used the INTELLIJET mark for a commercial purpose.[2]

As an initial matter, the Court observes that Plaintiffs' argument seems to conflate "commerce" and "use in commerce." "Commerce" is defined in 15 U.S.C. § 1127 as "all commerce which may lawfully be regulated by Congress."  This is a broad definition, as Congress has the power to regulate any activity that substantially affects interstate commerce.  *See United States v. Lopez*, 514 U.S. 549, 559 (1995).  Just because a mark might be used in connection with activity that falls under the definition of "commerce," however, does not mean that the activity satisfies the "use in commerce" requirement for a valid trademark registration.  *See Planetary Motion, Inc. v. Techplosion, Inc.*, 261 F.3d 1188, 1194 (11th Cir. 2001) (noting that the Lanham Act uses the phrase "use in commerce" in "two different contexts).

---

[2] Plaintiffs' evidentiary support for these arguments comes, in large part, through the declarations of Beverly Marsh and Anne Marie Thomas, both of whom identify and authenticate a number of documents that Plaintiffs use to establish the aforementioned facts.  Defendant objects to the Marsh and Thomas declarations on various grounds.  (ECF Nos. 65 and 66.)  The Court overrules these objections and has considered the materials in ruling upon Defendant's motion for summary judgment.

In *Planetary Motion*, for example, the court noted that the distribution of software over the internet for end users was a "use in commerce" for purposes of meeting the Lanham Act's "jurisdictional predicate." *Id.* at 1194-95.  But that circumstance alone did not lead inexorably to the conclusion that the alleged owner of a software trademark used the mark in commerce for purposes of obtaining ownership rights to the mark.  "[T]he use of a mark in commerce also must be sufficient to establish *ownership rights* for a plaintiff to recover against subsequent users under section 43(a) [of the Lanham Act]." *Id.* at 1195  (emphasis in original).  Ownership requires "'use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark, . . . even without evidence of actual sales.'" *Id.* (quoting *New England Duplicating Co. v. Mendes*, 190 F.2d 415, 418 (1st Cir. 1951)).

Plaintiffs identify a number of activities using the "INTELLIJET" mark as evidence that the mark satisfies the Lanham Act's "use in commerce" requirement.  For example, NetJets demonstrates the software for customers and potential customers and has provided information to customers about the IntelliJet software in various newsletters and in-flight literature available to NetJets customers.  NetJets also emphasizes that it uses the software to "interact" with third-party vendors and to connect with "other externally-facing applications used by NetJets employees."  As another example, NetJets notes that pilots and crew members use IntelliJet software applications and access data using their Blackberry® phones.  Further, NetJets contends that it "utilizes" the IntelliJet software to sell aircraft.  NetJets argues that the IntelliJet software is "transported" in commerce through many of these uses and further emphasizes the fact that it has licensed the software to related entities of NetJets.  As of 2012, NetJets says that "there were

at least 500 and potentially 750 users of IntelliJet software within NetJets and its related entities."

The Court does not doubt the value of the IntelliJet software.  It is undisputed in this case that the IntelliJet software is an integral part of NetJets' operation and that NetJets has invested a considerable amount of money in developing and improving the software.  The Court even recognizes that NetJets does, to some degree, publicize the existence and the functionality of the IntelliJet software—and the INTELLIJET mark—in activities related to NetJets' core business of selling fractional ownership programs for aircraft and serving the air transportation needs of their customers.  But this does not mean that NetJets' use of the INTELLIJET mark is "use in commerce" within the meaning of the Lanham Act.

The Court finds the Federal Circuit's decision in *Lens.com* to be highly persuasive in deciding the "use in commerce" issue presented here.  As in this case, it was not contested in *Lens.com* that the trademark registrant did not sell the software at issue.  Thus, the focus of the case was whether the Lens.com software was a "good" that was "transported in commerce." *Lens.com*, 686 F.3d at 1380.

Applying the same factors as the Federal Circuit in *Lens.com*, the Court reaches the same conclusion with respect to the INTELLIJET mark associated with NetJets' IntelliJet software. Just as with the software at issue in *Lens.com*, the IntelliJet software is simply the conduit through which NetJets provides its services.  To be sure, Plaintiffs have submitted a wealth of documentary evidence and deposition testimony with regard to the importance of the IntelliJet software to NetJets and the various ways that NetJets uses it to support virtually every aspect of NetJets' business.  It is evident from the record that NetJets has invested a great deal of money and manpower in the development of the IntelliJet software and has touted to customers and

19

potential customers the ways in which IntelliJet enhances the NetJets experience.  But the central theme in all of the uses of the IntelliJet software is that they are all associated with obtaining NetJets' aviation services.  NetJets is not marketing the software for the software's sake: it is using the software as the necessary tool to provide a high level of service to its customers. Fundamentally, the use of the IntelliJet software by NetJets is no different than the use of the "LENS" software at issue in *Lens.com*.  In each case, the software is the conduit through which the services are provided to customers.

As to the second factor, the software at issue in this case is "inextricably intertwined" with the service that NetJets provides to its customers.  In *Lens.com*, the court found that the Lens.com software facilitated the customers' online ordering, providing customers an enhanced consumer experience that provided greater value to Lens.com's online retail services.  *Id.* Similarly here, the IntelliJet software is inextricably intertwined with the comprehensive flight services that NetJets provides.  Though distribution of software over the internet is a commercial use, the key question for trademark validity purposes is "whether consumers actually associate a mark with *software*, as opposed to other services."  *Id.* at 1381 (emphasis in original).

Plaintiffs have offered evidence showing a multitude of ways in which NetJets has highlighted for customers and potential customers the existence of the IntelliJet software and the software's capability.  Plaintiffs have even shown evidence that it has shown the INTELLIJET mark in reference to the software in materials distributed to customers and potential customers. But the evidence also shows that the IntelliJet software's existence is universally associated with NetJets.  In other words, INTELLIJET is revealed exclusively as part and parcel of the services that NetJets provides.  Like the software in *Lens.com*, this factor makes the IntelliJet software inextricably intertwined and associated with NetJets' aviation services.  And the software has no

viable existence apart from NetJets for the simple fact that NetJets does not sell the software or otherwise make the software available to users in the marketplace. To the contrary, the IntelliJet software is proprietary to NetJets and NetJets considers it a trade secret that gives it an edge on its competition.

Finally, the third factor also cuts against trademark validity. It is not disputed that Defendants do not sell the IntelliJet software separately from the services that NetJets provides. Nor can the Court find that the IntelliJet software has "independent value apart from the services" provided by NetJets. *Lens.com*, 686 F.3d at 1382. While the Court has no doubt that the IntelliJet software *would* have value *if* it were sold in the marketplace, such is not the relevant inquiry here. This factor, like the others, is supposed to "shed light on whether [the] software is an independent *good* being 'sold or transported in commerce.'" *Id.* (emphasis in original). There is no evidence in this case that NetJets' IntelliJet software has an "independent value" as it relates to NetJets' customers and potential customers. The software is not a separate good or commodity sold or transported in commerce; rather, the software enhances the overall experience of NetJets' customers and is an integral part of NetJets' business operation. Just as the "LENS" software in *Lens.com* could not be trademarked despite the software providing greater value to Lens.com's online retail services, *id.*, so too is INTELLIJET not validly trademarked.

The purpose of a trademark is to distinguish goods and to identify the source of goods. *In re Sones*, 590 F.3d 1282, 1287 (Fed. Cir. 2009) (citing *In re Int'l Flavors & Fragrances Inc.*, 183 F.3d 1361, 1367 (Fed. Cir. 1999)). To this end, the Lanham Act requires an applicant to show "use in commerce," which is "the bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127; *see also Modular Cinemas of Am. v. Mini Cinemas Corp.*, 348 F. Supp. 578,

582 (S.D.N.Y. 1972) ("The gist of trademark rights is its actual use in trade.").  The Court agrees with Defendant that NetJets is not using the INTELLIJET mark in this manner.  Accordingly, the Court grants Defendant's motion for summary judgment on the Lanham Act claims alleged in Counts I and II of Plaintiffs' complaint.

### B.  Likelihood of Confusion

Even if Plaintiffs can show that NetJets' use of the INTELLIJET mark is a "use in commerce" within the meaning of the Lanham Act, there must also be a "likelihood of confusion" between the parties' respective uses of "IntelliJet" in order for Plaintiffs to have a valid claim.  Whether an alleged infringer's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties, is "[t]he touchstone of liability."  *Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc*., 326 F.3d 687, 694 (6th Cir. 2003).

Because we have found that Plaintiffs do not have a protectable mark in INTELLIJET, however, this Court need not address whether there is a likelihood of confusion between the marks.  *See e.g. Papa Ads, LLC v. Gatehouse Media, Inc.*, 485 F. App'x 53, 56 (6th Cir. 2012); *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 635 (6th Cir. 2012).

### C.  Abandonment

Defendant's motion also seeks summary judgment on Count I of its amended counterclaim, seeking cancellation of NetJets' registration of the INTELLIJET trademark on the grounds of abandonment.  Though Defendant has since filed a second amended counterclaim

alleging an additional basis of cancellation (*i.e.*, that NetJets' registration was "void *ab initio*"), the Court will address the abandonment counterclaim in the interests of judicial economy.[3]

"Abandonment" is defined in 15 U.S.C. § 1127.  Under the statute, a mark is deemed "abandoned" when either of the following occurs:

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. *"Use" of a mark means the bona fide use of such mark made in the ordinary course of trade*, and not made merely to reserve a right in a mark.

> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127 (emphasis added).  Abandonment is a ground for cancelling a mark even when that mark is otherwise incontestable.  *See* 15 U.S.C. § 1115(b)(2).

As Defendant acknowledges in its motion for summary judgment, most cases of alleged abandonment of a trademark involve a situation where the owner was at one point making commercial use of the mark.  Abandonment may also be established, however, through proof that a registrant is not using or has never used its mark in commerce.  *See e.g. Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 1579-82 (Fed. Cir. 1990) (finding abandonment of mark on basis of nonuse).  Indeed, the *Lens.com* case analyzed above was an abandonment case: the court affirmed the TTAB's decision that the mark at issue was not in "use in commerce" and

---

[3] At a telephone status conference convened on November 20, 2013, this Court set a briefing schedule for dispositive motions relating to Defendant's second amended counterclaim.  (ECF No. 83.)  The Court still deemed Defendant's motion for summary judgment submitted and ripe for decision, including the part of the motion seeking summary judgment on Defendant's counterclaim for cancellation on the basis of abandonment.  Because Defendant's second amended counterclaim still contains in Count I a claim for cancellation based on abandonment, the Court addresses that issue here, as the parties have fully briefed it.

was therefore abandoned within the meaning of 15 U.S.C. § 1127.  *See Lens.com*, 686 F.3d at 1383.

This Court has already found above that Defendant is entitled to summary judgment on Plaintiffs' Lanham Act claims because NetJets has not placed INTELLIJET in "use in commerce" within the meaning of the Act.  In light of the Court's decision on the "use in commerce" issue, Defendant is likewise entitled to summary judgment on its counterclaim for cancellation of the INTELLIJET mark on the basis of abandonment.

### D.  Common Law Trademark and Ohio Statutory Claims

Defendant also moves for summary judgment on Plaintiffs' claim of common law trademark infringement. Though Defendant contends in its reply brief that Plaintiffs did not plead a claim for common law trademark infringement, the Court disagrees.  Count I of Plaintiffs' Complaint expressly alleges infringement under both the Lanham Act and Ohio common law.

On the merits, the Court finds that its grant of summary judgment on Plaintiffs' Lanham Act claims also renders summary judgment appropriate on Plaintiffs' common law claims.  As Plaintiffs themselves observe, an analysis of Ohio common law trademark rights is the same as federal law rights.  (Pls.' Opp'n, ECF No. 64 at PageID# 3073.)  *See Abercrombie & Fitch*, 280 F.3d at 626 n.1 (citing *Leventhal & Assocs., Inc. v. Thomson Cent. Ohio*, 128 Ohio App. 3d 188, 714 N.E. 2d 418, 423 (Ohio Ct. App. 1998)); *ETW Corp. v. Jireh Pub'g, Inc*., 332 F.3d 915, 920 (6th Cir. 2003) ("Because trademark claims under Ohio law follow the same analysis as those under the Lanham Act, our discussion of the federal trademark claims will therefore encompass the state trademark claims as well.").  Accordingly, for the same reasons articulated above with

respect to Plaintiffs' Lanham Act claims, Defendant is entitled to summary judgment on Plaintiffs' common law trademark infringement claim contained in Count I of the complaint.

### E. Attorney's Fees

Section 35 of the Lanham Act, 15 U.S.C. § 1117 allows the Court to award attorney's fees to the prevailing party "in exceptional cases."  Defendant argues that this is an "exceptional case" that calls for the award of attorney's fees.  The Court denies Defendant's motion for summary judgment on the attorney's fees question, as an award of fees is not appropriate.

In applying 15 U.S.C. § 1117(a) to a prevailing defendant, the Sixth Circuit has held that an "exceptional" case is one "where a plaintiff brings a suit that could fairly be described as oppressive."  *Eagles, Ltd. v. American Eagle Foundation*, 356 F.3d 724, 728 (6th Cir. 2004) (internal quotations omitted).  An award of attorney's fees is *not* appropriate if the plaintiff brought suit under a colorable, albeit unsuccessful, argument.  *Id.* (quoting *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc*., 185 F.3d 606, 625 (6th Cir. 1999)).  The test for whether a Lanham Act suit is oppressive "requires an objective inquiry into whether the suit was unfounded when it was brought and a subjective inquiry into the plaintiff's conduct during litigation."  *Id.* at 729.

The Court cannot find, as a matter of law, that this is an "exceptional case" under 15 U.S.C. § 1117(a).  Though the Court was ultimately unconvinced by Plaintiffs' arguments, the Court finds there to have been at least a colorable argument that NetJets used INTELLIJET in a manner that satisfied the "use in commerce" requirement for valid trademark registration.  It is within the realm of possibility to obtain a trademark over software, even if the software is not necessarily sold to end users.  *See generally Planetary Motion*, 261 F.3d 1188.  Given this possibility, combined with the importance of the IntelliJet software to NetJets' overall business,

NetJets' use of the INTELLIJET mark for commercial purposes, and the fact that Defendant is using the IntelliJet name in an aviation-related enterprise, the Court is unable to find that this lawsuit was objectively unfounded.

Moreover, it is significant that this Court relies heavily upon the Federal Circuit's decision in *Lens.com* as persuasive authority guiding the Court's decision in this case.  For purposes of the attorney's fees issue, it is noteworthy that the Federal Circuit did not decide *Lens.com* until August 3, 2012, several months after Plaintiffs commenced this lawsuit.  Thus, even if the Court were inclined to decide that Plaintiffs did not have a colorable argument in light of the holding in *Lens.com*, the Court is unable to conclude as a matter of law that Plaintiffs brought an "oppressive" suit in this case when Plaintiffs did not have the benefit of the Federal Circuit's decision in *Lens.com* at the time they sued Defendant in this case.

INTELLIJET has not been in "use in commerce" as defined in the Lanham Act, but the Court does not find the legal conclusion in this regard to be as clear cut as Defendant characterizes it.  The Court therefore denies Defendant's motion for summary judgment as to the issue of Defendant's recovery of attorney's fees under 15 U.S.C. § 1117(a).

**V.**

For the reasons articulated above, the Court **ORDERS** as follows:

1.      The Court **GRANTS** Plaintiffs' motion for leave to file a sur-reply. (ECF No. 69.)

2.      The Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion to preclude evidence and testimony relating to the expert report of Anne H. Chasser.  (ECF Nos. 47, 53.)  The Court grants the motion as to Chasser's legal opinion regarding the validity and incontestability of Plaintiffs' INTELLIJET mark and regarding common law trademark rights, but denies the motion with respect to Chasser's opinion regarding likelihood of confusion.

3.      The Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion for summary judgment.  (ECF Nos. 48 and 51.)  The Court grants summary judgment to Defendant on the Lanham Act claims alleged in Counts I and II of Plaintiffs' complaint and on the common law trademark claim included in Count I of the complaint.  The Court also grants summary judgment to Defendant on Count I of Defendant's second amended counterclaim as it relates to cancellation on the basis of abandonment.  The Court denies summary judgment on the issue of Defendant's recovery of attorney's fees.

**IT IS SO ORDERED.**

/s/ Gregory L. Frost
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**