**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**NETJETS INC., et al.,**

      **Plaintiffs,**                    **Case No. 2:12-cv-00059**

                                           **Judge Gregory L. Frost**

**v.**                                **Magistrate Judge Norah McCann King**

**INTELLIJET GROUP, LLC,**

      **Defendant.**

**OPINION AND ORDER**

This matter is before the Court on remand from the Sixth Circuit Court of Appeals to address several arguments raised in Defendant's motion for summary judgment (ECF Nos. 48 & 51). To address those arguments, the Court considers Defendant 's supplemental memorandum in support of its motion for summary judgment (ECF Nos. 97 & 98), NetJets' response in opposition to Defendant's supplemental memorandum (ECF Nos. 101 and 102), and Defendant's reply in support of its supplemental memorandum (ECF No. 103).

For the reasons that follow, the Court **GRANTS** summary judgment in Defendant's favor on each of NetJets' claims and on Defendant's counterclaim.

I.      **BACKGROUND**

      A.  <u>Facts</u>

The facts of this case are set forth in more detail in the Court's December 19, 2013 Opinion and Order granting Defendant's motion for summary judgment. (ECF No. 85.) For ease of reference, the relevant section of that Opinion and Order is reproduced below.

1

### 1. NetJets' Business

Plaintiff NetJets is a private aviation company headquartered in Columbus, Ohio. NetJets' predecessor, Executive Jet Aviation, originated in Columbus in 1964 as a private business jet charter and aircraft management company.  Today, NetJets markets itself as a full service private aviation solution provider, offering among other things fractional ownership of jet aircraft, jet lease management, and jet charter services.  NetJets' most widely known service is fractional jet ownership, which allows for either the purchase or lease of a "share" of an aircraft for a certain number of hours of usage each year.  (For example, an owner of a $1/16^{th}$ share has 50 hours annually for the specific aircraft type for which the share is purchased or leased.)  NetJets' fractional ownership clients are therefore able to buy a share of a private jet at a fraction of the cost of owning a whole aircraft.

In addition to fractional aircraft ownership, NetJets offers aircraft leasing through Marquis Jet Partners, Inc. ("Marquis"), a company that NetJets acquired in 2010.  Marquis offers the "Marquis Jet Card," which is a sublease of an aircraft in the NetJets program for a set number of hours.  The Marquis Jet Card program allows customers to access aircraft from NetJets' fleet without having to purchase or lease a fractional share.  Before NetJets bought Marquis in 2010, Marquis was NetJets' largest customer for fractional shares, which Marquis would then resell under its card program.  In addition to the NetJets' fractional share business and the Marquis business, NetJets manages fleet operations internationally through an entity known as NetJets Europe.  Overall, NetJets provides more than 300,000 flights throughout 170 countries for its customers.

## 2.  *The IntelliJet Software*

In order to help manage its operations, NetJets began in the 1990s to develop its own customized and proprietary software program, which it called "IntelliJet."  NetJets began developing the software internally in 1994.  Approximately six employees worked on the software's development, including the writing of the source code and the software's debugging.  This first iteration of the IntelliJet software included modules for contracts and accounts, reservations, flight following, crew management, airport management, billing, and crew communications.  NetJets did not license the IntelliJet software program to any third party.  Though there was some interest from third parties to acquire a license to use the software, NetJets chose not to do so in order to maintain a competitive advantage in its business.  From 1995 through 2000, no one other than certain employees of NetJets and NetJets' related companies had access to the IntelliJet software.

In the years following the development of the first version of the IntelliJet software, NetJets' employees worked on improvements and refinements to the software.  NetJets eventually launched an upgraded version of the software, which it dubbed "IntelliJet II."  The latter software program performs the same functions as IntelliJet I, but, according to NetJets, is greatly enhanced to provide additional features for NetJets owners.

According to testimony in the record, approximately 220 employees in NetJets' IT department support the IntelliJet system.  NetJets invests a considerable amount of money to maintain and develop upgrades to the software; the upgrade from "IntelliJet I" to "IntelliJet II," for example, cost NetJets approximately $20 million to implement.  The IntelliJet software has been and continues to be located on servers in Columbus, Ohio.

Under previous versions of the IntelliJet software, NetJets' customers (or "owners" as NetJets calls them) did not have direct access to the IntelliJet software.  With IntelliJet II, however, there is now an "owner's portal" that allows owners to access the system from the internet and perform such tasks as changing their preferences or making flight reservations. When owners log into the website, the INTELLIJET name is displayed on the screen.  The owner's portal went "live" for NetJets owners in January 2013.  While NetJets' owners can now see the INTELLIJET name when they log in to their NetJets' accounts, there is no evidence or testimony to indicate that the INTELLIJET name is displayed to non-NetJets owners who access the NetJets website over the internet.

### 3. *NetJets' Touting of the IntelliJet Software*

NetJets considers the IntelliJet software to be proprietary and a trade secret.  NetJets also considers the IntelliJet software to be a vital part of its business and a point of emphasis when discussing NetJets' operation with customers and potential customers.  Over the years, NetJets has included discussion of the IntelliJet software's functionality in newsletters to owners and in literature provided to passengers on NetJets' airplanes.  NetJets' brochures for both its fractional share business and the Marquis Jet Card business have also mentioned the IntelliJet software.  NetJets consistently refers to the software as "IntelliJet®" to show that it has a registered trademark in the software's name.

NetJets also uses IntelliJet in tours of NetJets' facility in Columbus, Ohio given to customers and potential customers.  During these tours, NetJets shows off some of the features of the IntelliJet software.  NetJets has also offered into evidence several magazine articles about NetJets that have mentioned the IntelliJet software.

4

#### 4.  Defendant  IntelliJet Group LLC

Defendant IntelliJet Group LLC is a Florida limited liability company that has operated under the name "IntelliJet International" since 2005.  IntelliJet International is in the business of providing aircraft brokerage services, helping clients either sell or acquire jet aircraft.  The company deals primarily in Gulfstream, Bombardier, and Dassault jet aircraft ranging in price from $10 million to $60 million.  In recent years, IntelliJet International has also provided aircraft leasing services through a division of the company and has expanded its business into the area of aircraft management.

Gary Spivack is the founder and 50 percent owner of IntelliJet Group.  Spivack testified in his deposition that he was the person who came up with the name "IntelliJet" for his company.  Spivack conducted internet searches in 2005 to ascertain whether the name "IntelliJet" was being used.  Spivack testified that he found "seven or eight different IntelliJet trademarks," including the one held by NetJets.  Spivack did not consider NetJets' registration of the INTELLIJET trademark to be an impediment to his use of "IntelliJet."  Since NetJets' registration was for software and Defendant IntelliJet did not sell software, Spivack saw "absolutely no problem with" using the IntelliJet name for his company.

#### 5.  Registration of the Marks at Issue

In December 1995, NetJets (then known as "Executive Jet, Inc.") filed a federal trademark application for the INTELLIJET mark.  The United States Patent and Trademark Office ("PTO") approved the application and issued Registration Certificate No. 2,025,410 for INTELLIJET in December 1996 for "computer software for managing aircraft leasing and sales."  Nearly six years later, in September 2002, NetJets filed a Combined Declaration of Use and Incontestability with the PTO, informing the PTO that the INTELLIJET mark had

5

been used in commerce for five consecutive years after the date of registration.  The PTO approved the declaration, thereby granting INTELLIJET incontestability status under 15 U.S.C. § 1065.  In 2003, NetJets Columbia ("Columbia") obtained the INTELLIJET mark from NetJets in connection with its purchase of certain intellectual property.  Columbia owns the INTELLIJET mark, while NetJets is the licensee.[1]

In May 2012, while this litigation was pending, Defendant filed a service mark application with the PTO.  Defendant sought registration of its "IntelliJet International" service mark, which consists of "the word 'INTELLIJET', stylized and in block lettering, with a design of a jet attached to the top of the letter 'J' and connected to the first letter 'I' by a line, and the word 'INTERNATIONAL', stylized and in block lettering, underneath the word 'INTELLIJET.'"  As of the time of the summary judgment briefing in this case, Defendant's service mark application remained pending at the PTO.

### 6.  *NetJets Files Suit against IntelliJet*

NetJets and Columbia (collectively, "NetJets") commenced this action in January 2012, alleging claims of trademark infringement (Count I) and false designation of origin (Count II) under the Lanham Act, 15 U.S.C. § 1051 et seq.  (Compl., ECF No. 1 at ¶¶ 26-35.) The complaint also alleges Ohio law claims for deceptive trade practices under Ohio Rev. Code § 4165 et seq. (Count III) and for common law unfair competition and injury to business reputation (Count IV).  (*Id.* at ¶¶ 36-40.)

---

[1] In their briefing in opposition to Defendant's motion for summary judgment, Plaintiffs consistently uses "INTELLIJET" (*i.e.*, in all capital letters) when referring to the registered trademark and "IntelliJet" when referring to the software itself.  The Court accordingly does the same in this Opinion and Order.

Defendant answered and filed a counterclaim.  (ECF Nos. 10 and 11.)   In Count I of an amended counterclaim, Defendant pleaded a claim for cancellation of NetJets' INTELLIJET mark on the basis of abandonment.  (ECF No. 11 at ¶¶ 1-6.)  Defendant also pleaded in Count II of the amended counterclaim a claim for unfair competition under Ohio law.  (*Id.* at ¶¶ 7-10.)  This Court later granted Defendant leave to file a second amended counterclaim.  (ECF No. 73.)  Defendant 's second amended counterclaim added to Count I a claim for cancellation of NetJets' mark based on a theory that NetJets' registration was "void *ab initio*" because NetJets was not using the mark in commerce as of the date that the trademark application claimed first use of INTELLIJET.  (ECF No. 82 at ¶ 7.)

### B.  Defendant's Motion for Summary Judgment

Defendant IntelliJet moved for summary judgment on NetJets' claims for trademark infringement and false designation of origin under the Lanham Act and on Defendant's counterclaim to cancel NetJets' registration of INTELLIJET.  Defendant's motion also addresses NetJets' claim of common law trademark infringement contained in Count I of the complaint along with the Lanham Act claim.

In its motion, Defendant argued that NetJets has never used the INTELLIJET mark in commerce within the meaning of the Lanham Act.  NetJets responded that its use of the INTELLIJET mark constitutes "use in commerce" because: "(a) the software has been in use since its inception, (b) the software and its trademarked name have achieved public recognition, (c) the software has been subject to interstate transportation, and (d) the software has been licensed to third parties."  (ECF No. 64, at PAGEID # 3060.)

This Court rejected NetJets' arguments.  Relying on the Federal Circuit's opinion in *Lens.com v. 1-800 Contacts*, 686 F.3d 1376 (Fed. Cir. 2012), this Court found that the

7

Intellijet software was "simply the conduit through which NetJets provides its services," (ECF No. 64, at PAGEID # 4887), that does not have independent value apart from the services NetJets provides.  Notably, in reaching this holding, this Court rejected NetJets' arguments that its tours to customers in which it touted the Intellijet software, articles about the software, public recognition of the same, and licenses to foreign entities such as NetJets Europe were sufficient to establish "use in commerce" within the meaning of the Lanham Act.

Because the mark was not used in commerce, this Court granted Defendant's motion for summary judgment on the two Lanham Act claims (Counts I and II) alleged in NetJets' complaint.  This Court likewise granted Defendant's motion for summary judgment on its counterclaim to cancel NetJets' INTELLIJET registration.  Finally, reasoning that Ohio's common law parallels the Lanham Act, this Court granted Defendant's motion for summary judgment on NetJets' claim for common law infringement (Count I).

### C. Subsequent Procedural History

The Sixth Circuit reversed this Court's grant of summary judgment.  (ECF No. 92.)  In its decision, the Sixth Circuit found that a factual dispute exists regarding whether NetJets marketed and/or sold the Intellijet software to other private-plane companies.  The court stated:

> NetJets did, in fact, put forward evidence that it has sold the Intellijet software itself, rather than the private-plane services, to two external customers: Marquis Jet Partners and National Private Air Transport Services Company Limited.  Marquis Jet Partners was an independent company that purchased a significant number of fractional shares from NetJets and subdivided those shares into smaller amounts of time, called "jet cards," which it then sold to its own customers.  NetJets presented testimony that it licensed Marquis to use the IntelliJet software to manage its jet-card business before purchasing Marquis in 2010.  National Private Air Transport Services Company Limited operated NetJets Middle East under a "franchise type of arrangement," which included a "Technical Services Agreement" for use of IntelliJet software.  The

8

arrangement ended in October 2011. IntelliJet calls into question the nature of these agreements, particularly because no written agreement for the Marquis license could be found. The questions about the nature and existence of these licenses are nonetheless sufficient to call into question whether NetJets was marketing software, under the INTELLIJET mark, to other private-plane companies. In light of the dynamics of the private-plane industry and the nature of the software product, **a reasonable jury could find such limited market involvement to nonetheless reflect a "bona fide use … in the ordinary course of trade," 15 U.S.C. § 1127, and that NetJets had therefore not abandoned the mark.**

(ECF No. 92, at PAGEID # 4919–20 (emphasis added).)

Stated differently, the court held that there exists a genuine issue of fact regarding whether NetJets was using the mark in commerce by marketing the software to *external* customers such as Marquis and NAS.  This holding does not disturb this Court's initial finding that licenses to other NetJets entities (such as NetJets Europe and Executive Jet Management) do not constitute use in commerce.  This holding similarly does not disturb this Court's initial finding that NetJets' references to the software during tours, the fact that third parties have written about the software, and the importance of the software to NetJets' business do not translate to a finding that NetJets is using the software in commerce within the meaning of the Lanham Act.

The Sixth Circuit defined the specific issues this Court should consider on remand. Those issues are:

- "whether there was a separate defect in the ownership of the mark other than abandonment;"

- "whether NetJets owns an unregistered interest in the INTELLIJET mark in connection with its fractional-ownership or other services and whether it pled such an interest;" and

- "whether Intellijet Group's use of the mark created a likelihood of confusion for private-plane companies that may seek to buy the software in the future."

(*Id*. at PAGEID # 4920.)

Following receipt of the Sixth Circuit's mandate, the Court set a briefing schedule for supplemental memoranda in support of the parties' previous filings. Defendant filed a supplemental memorandum in support of its motion for summary judgment, NetJets filed a supplemental memorandum in opposition to that motion, and Defendant filed a supplemental reply in support of its motion.

The parties' supplemental briefs do not directly address the case as it stands on remand. Defendant spends much of its briefs arguing that the Sixth Circuit erred in its decision, while NetJets advances the same arguments it made to this Court in the first instance. The Court proceeds to consider the parties' arguments within the limited scope of the Sixth Circuit's holding that a factual dispute exists regarding NetJets' licenses to external customers such as Marquis and NAS.

## II.    ANALYSIS

### A. <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court therefore may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251–52).

## B. <u>Law-of-the-Case Doctrine</u>

The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Scott v. Churchill,* 377 F.3d 565, 569–70 (6th Cir.2004) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  The doctrine refers to any issues that were decided at an earlier stage of the litigation either explicitly or implicitly or by necessary inference from the disposition. *McKenzie v. BellSouth Telecomm. Inc*., 219 F.3d 508, 513 n. 3 (6th Cir. 2000) (quoting *Hanover Ins. Co. v. American Eng'g Co*., 105 F.3d 306, 312 (6th Cir.1997)) (citations omitted).

The mandate rule is a specific application of the law-of-the-case doctrine.  *See McKenzie*, 219 F.3d at 513 (citing *Jones v. Lewis*, 957 F.2d 260, 262 (6th Cir. 1992)).  Under this rule, when a case has been remanded by an appellate court, "the trial court is bound 'to proceed in accordance with the mandate and the law of the case as established by the

appellate court,' " and thereby is precluded from reconsidering any aspect of the law of the case. *McKenzie*, 219 F.3d at 513 n. 3 (quoting *Hanover Ins. Co*., 105 F.3d at 312) (citations omitted).  The trial court is bound by "both the letter and the spirit" of the mandate, "taking into account the appellate court's opinion and the circumstances it embraces."  *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994).

Here, although Defendant argues that "[t]he evidence cited by the Sixth Circuit is insufficient to create a fact issue that can defeat a motion for summary judgment," (ECF No. 98, at PAGEID # 5176), it does not argue that a specific exception to the mandate rule applies.  Defendant's argument is illogical given that the Sixth Circuit reversed this Court's grant of summary judgment and explicitly found that an issue of fact exists that defeats a motion for summary judgment on the issue of whether NetJets used the INTELLIJET mark in commerce.

Put simply, Defendant had its chance to argue that "the existence of a license or sublicense between Plaintiffs and Marquis is legally impossible," (ECF No. 98, at PAGEID #5179), and that "[t]he 'Technical Services Agreement' between NetJets Middle East ("NJME") and National Private Air Transport Services Company Limited ("NAS") . . . fails to demonstrate that the INTELLIJET mark has been used in commerce for software in the United States" (*id*. at PAGEID # 5180).  The Sixth Circuit explicitly rejected those arguments. This Court, therefore, is foreclosed from determining that NetJets did not use the INTELLIJET trademark in commerce during the time it allegedly licensed the Intellijet software to Marquis (time period unknown) and during the duration of the Technical Services Agreement with NAS (August 1, 2009 through 2011, *see* ECF No. 64-6, at PAGEID # 3406).

**C.** **<u>First Issue: Whether There Was A Separate Defect In The Ownership Of The Mark</u>**

Turning to the issues that this Court may consider on remand, the first issue is whether the INTELLIJET mark is void *ab initio* such that there is a separate defect in the ownership of the mark other than abandonment.  Defendant argues that the mark is void *ab initio*—i.e., the mark was never valid—because it had not been used in commerce as of July 1995 (when NetJets registered the mark with the PTO).  NetJets responds by arguing that the mark is incontestable because it was not successfully challenged within five years of its registration.  As such, NetJets argues, the specific challenges to incontestable marks set forth in 15 U.S.C. § 1115(b) are the only challenges the Court may consider.  Because void *ab initio* is not listed among those challenges, it is not (according to NetJets) properly before the Court.  Defendant responds by asserting that a registration that is void *ab initio* can never become incontestable.

The Court begins its analysis by examining the statutory framework surrounding trademark registration and incontestable trademarks.  Pursuant to the Lanham Act, "[t]he owner of a trademark used in commerce may request registration of its trademark on the principal register hereby established by paying the prescribed fee and filing in the [PTO] an application and a verified statement."  15 U.S.C. § 1051(a)(1).  "The statement shall be verified by the applicant and specify that . . . the mark is in use in commerce" (among other requirements).  *Id*. § 1051(a)(3)(C).  The Lanham Act provides a specific procedure for opposing a trademark application at the time of registration.  *See id*. § 1063 ("Opposition to Registration").

Once a mark is successfully registered, the registration "shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the

13

registration of the mark, of the registrant's ownership of the mark, and of the registrant's

exclusive right to use the registered mark in commerce on or in connection with the goods or

services specified in the registration subject to any conditions or limitations stated therein."

*Id.* § 1115(a).  These issues (validity, ownership, exclusive right to use), however, are subject

to challenges from petitioners seeking to cancel the mark.  Pursuant to § 1064, a challenger

may file a petition to cancel a registration of a mark "[w]ithin five years from the date of

registration of the mark," or at any time if the registered mark becomes the generic name for

the goods or services for which it is registered, if the mark has not been published, and/or in

certain cases if the mark is a certification mark (which is not at issue in this case).  *Id.*  §

1064(1)–(5).

 If a mark is not challenged within five years of its registration date, then the Lanham

Act's incontestability provisions become relevant.  Pursuant to § 1065,

> Except on [grounds that are not applicable to this case], the right of the owner
> to use [a] registered mark in commerce for the goods or services on or in
> connection with which such registered mark has been in continuous use for
> five consecutive years subsequent to the date of such registration and is still in
> use in commerce, shall be incontestable . . . .

*Id.* § 1065.  Once a mark becomes incontestable,

> [T]he registration shall be conclusive evidence of the validity of the registered
> mark and of the registration of the mark, of the registrant's ownership of the
> mark, and of the registrant's exclusive right to use the registered mark in
> commerce . . . subject to the following defenses or defects:
>
> > (1) That the registration or the incontestable right to use the
> > mark was obtained fraudulently; or
> >
> > (2) That the mark has been abandoned by the registrant; or
> >
> > (3) That the registered mark is being used by or with the
> > permission of the registrant or a person in privity with the

registrant, so as to misrepresent the source of the goods or services on or in connection with which the mark is used; or

(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin; or

(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057(c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title: Provided, however, That this defense or defect shall apply only for the area in which such continuous prior use is proved; or

(6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: Provided, however, That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or

(7) That the mark has been or is being used to violate the antitrust laws of the United States; or

(8) That the mark is functional; or

(9) That equitable principles, including laches, estoppel, and acquiescence, are applicable.

*Id*. § 1115(b).

The question for the Court is whether the INTELLIJET mark has become incontestable.  To make that determination, the Court must consider whether NetJets meets the requirements of § 1065.  Specifically, the Court must determine whether NetJets' Intellijet product bearing the INTELLIJET mark was "in continuous use for five consecutive years subsequent to" July of 1995 and whether the mark is still in use in commerce.  *Id.* § 1065. Only then does the mark have incontestable status under § 1065.

Defendant argues that the INTELLIJET mark was not in use in commerce in 1995 and between the years of 1995 through 2001 because it is undisputed that NetJets only used the Intellijet product internally during that time.  NetJets' Rule 30(b)(6) witness testified to this effect:

> Q. In 1995 when IntelliJet I was rolled out, did anyone outside of the employees of NetJets have access into IntelliJet I?
> A. You're referring to NetJets as the overall entity?
> Q. Correct.
> A. That is correct.
> Q. The answer is no one did?
> A. No one did.
> Q. In 1996 did anyone outside of the employees of the NetJets companies have access to IntelliJet I?
> A. No.
> Q. In 1997 did anyone outside of the employees of the NetJets companies have access into IntelliJet I?
> A. No.
> Q. In 1998 did anyone other than employees of NetJets' companies, have access to IntelliJet I?
> A. No.
> Q. In 1999 did anyone other than employees of NetJets' companies have access to IntelliJet I?
> A. No.
> Q. In 2000 did anyone other than employees of NetJets' companies have access to IntelliJet I?
> A. No.

(ECF No. 41, at PAGEID # 1008–1009.)  Defendant notes that, given these undisputed facts, the affidavit of incontestability that NetJets filed in 2002 should never have been filed.

16

NetJets does not directly address this issue.  In fact, NetJets does not make any attempt to explain why the INTELLIJET mark is incontestable or why it satisfies the requirements of § 1065, choosing instead to jump straight to the issue of whether certain challenges can be leveled against incontestable marks.  It goes without saying, however, that the Court must first examine whether the INTELLIJET mark satisfies the requirements of § 1065 before it can consider NetJets' argument.  *See id*. § 1065; *Park 'N Fly v. Dollar Park & Fly, Inc*., 469 U.S. 189 (1985) (holding that § 1115(b) "provides that registration is conclusive evidence of the registrant's exclusive right to use the mark, *subject to the conditions of [§ 1065]* and the seven defenses enumerated in [§ 1115(b)] itself" (emphasis added)).  The Court made this exact point in its Opinion and Order granting Defendant leave to file its second amended counterclaim, noting that NetJets' proposed analysis "places the cart before the horse" because it assumes incontestability without first proving that the requirements of § 1065 have been satisfied.  (ECF No. 73, at PAGEID # 4703.)

NetJets' reliance on the Supreme Court's decision in *Park 'N Fly* is flawed in one important respect.  In *Park 'N Fly*, it was undisputed that the mark was incontestable under § 1065.  *See* 469 U.S. at 192–94 (1985).  The Supreme Court considered only whether the defendant properly challenged the incontestable mark as being "merely descriptive" such that it was not a valid trademark.  *See id*.  Unlike a "merely descriptive" challenge, however, the challenge raised in this case is an element of § 1065.  Such a challenge goes to the preliminary issue of whether the mark is incontestable, which was not at issue in *Park 'N Fly*.

The Court therefore must consider whether the INTELLIJET mark was in continuous use in commerce for the five years subsequent to its registration in July of 1995.  Because the Court already found that NetJets' internal use of the software (such as use in tours and

marketing materials, and via licenses to foreign NetJets entities) does not constitute use in commerce, the question is whether the Sixth Circuit's finding regarding sales to external customers applies to the time period between 1995 and 2001.

The testimony of NetJets' Rule 30(b)(6) witness (cited above) is evidence that there were no such sales to external customers during that time period.  NetJets does not attempt to rebut that evidence or offer any additional evidence that could create a question of fact on this issue.  NetJets does not argue, for example, that it marketed the software to Marquis during this time or that Marquis licensed the software during this time.  And although NetJets asserts that the agreement with NAS began in 1998, the Technical Services Agreement that the Sixth Circuit cited did not become effective until 2009.  *See* ECF No. 64-6, at PAGEID # 3406. NetJets therefore fails to offer any evidence that it was marketing the software to external customers during the time period between 1995 and 2001.

NetJets offers the additional argument that its statements to the PTO that it was using the mark in commerce are sufficient to establish use in commerce.  But crediting that argument would allow NetJets to invoke the protections of § 1065 without first satisfying § 1065's requirements.  To do so would effectively read the "with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration" language out of the statute.  *See* 15 U.S.C. § 1065.

The Court therefore agrees with Defendant that NetJets failed to present evidence that the mark was in continuous use in commerce for the five years subsequent to registration.  As such, the INTELLIJET mark is not entitled to incontestable status under § 1065.  Two conclusions stem from this finding: (1) NetJets' registration of the INTELLIJET mark constitutes only prima facie evidence (rather than conclusive evidence) of the mark's validity,

18

*see id.* at § 1115(a)–(b), and (2) Defendant is not limited to the challenges set forth in § 1115(b).

Defendant challenges the mark's validity on the ground that it is void *ab initio*—i.e., it was never valid because it was not used in commerce on the date of registration.  The evidence cited above (testimony from NetJets' Rule 30(b)(6) witness that only NetJets employees had access to the software when it was rolled out in 1995) is sufficient to rebut the presumption of validity and shift the burden to NetJets to provide evidence of use.

NetJets fails to present any such evidence.  Instead, NetJets argues that it is difficult to locate evidence from twenty years ago, that its signed declaration to the PTO is sufficient evidence that the mark was being used in commerce, and that it has a history of promoting its software to potential customers on tours.  None of this evidence establishes use in commerce within the meaning of the Lanham Act.  The Court therefore agrees with Defendant that the INTELLIJET mark is void *ab initio*.

Because only holders of registered marks can bring an infringement claim under § 1114, Defendant is entitled to summary judgment on NetJets' § 1114 claim (Count I).  *See* 15 U.S.C. § 1114.  Defendant likewise is entitled to summary judgment on its counterclaim to cancel NetJets' registration of INTELLIJET.

This holding does not dispose of NetJets' claim for infringement under Ohio's common law.  Because a party can acquire an unregistered interest in a mark through bona fide use in commerce, NetJets can still pursue a claim for infringement if it acquired such an interest and that interest is superior to Defendant's.  The question is whether NetJets began marketing its software to external customers (such as Marquis and NAS) prior to 2005, when Defendant began using the mark.

Having considered the parties' arguments, the Court finds that the Sixth Circuit's opinion disposes of this issue in NetJets' favor.  The Sixth Circuit found that there exists a question of fact regarding whether NetJets marketed its software to external customers such as Marquis and NAS.  There is no affirmative evidence (such as testimony from NetJets' Rule 30(b)(6) witness) suggesting that such marketing efforts took place after 2005.  As such, the law-of-the-case doctrine precludes this Court from determining that NetJets did not use the mark in commerce in or before 2005 as a matter of law.  The Court therefore cannot conclude that there exists a separate defect in ownership of the mark with respect to NetJets' common law claim.

### D.  Second Issue:  Whether NetJets Owns an Unregistered Interest in the INTELLIJET Mark in Connection With its Fractional-Ownership or Other Services and Whether it Pled Such an Interest

The analysis up to this point has referred to the Intellijet software product as a good. As the Court noted in its December 19, 2013 Opinion and Order, both parties treated the product as a good in their initial briefing on Defendant's motion for summary judgment.  *See* ECF No. 85, at PAGEID # 4882 ("The parties' briefing treats Plaintiffs' Intellijet software as a 'good.' ").  The Lanham Act defines the term "trademark" to include any mark used to "identify and distinguish [a person's] goods."  15 U.S.C. § 1127.

The Lanham Act (as well as Ohio's common law) also recognizes a separate type of mark: that of a "service mark."  A service mark is any word, name, symbol, or device:

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services,

> even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

*Id.*

NetJets argued to the Sixth Circuit, and now argues to this Court, that it uses the INTELLIJET mark to identify its services as well as its software product.  The first issue is whether NetsJets' argument is proper in this late stage of the litigation.

Although the Court shares Defendant's perplexity as to why NetJets did not clearly explain this theory in its complaint or during the initial summary judgment briefing, the Court ultimately agrees with NetJets that the complaint can be interpreted to put Defendant on notice of such a claim.  The complaint, while sparse, references the fact that "NetJets Inc. uses the INTELLIJET mark in connection with its software that supports aircraft sales and leasing [i.e., NetJets' services]."  (ECF No. 1 ¶ 19.)  NetJets' answer to Defendant's counterclaim also references NetJets' use of the INTELLIJET mark in connection with its private aviation - fractional aircraft services.  The Court finds these references sufficient to give Defendant fair notice of NetJets' theory of recovery and the grounds upon which it rests.

This finding is without consequence, however, because the Court finds that NetJets does not have any ownership rights in INTELLIJET as a service mark.  The Court made the factual finding in its December 19, 2013 Opinion and Order that the Intellijet software is "the conduit through which NetJets provides its services."  (ECF No. 64, at PAGEID # 4887.)  As explained below, conduits such as a software program through which an entity provides its services do not qualify as "service marks" under 15 U.S.C. § 1127.

21

According to the Trademark Manual of Examining Procedure, "[t]o function as a service mark, the asserted mark must be used in a way that identifies and distinguishes the source of the services recited in the application."  TMEP § 1301.02.  "A term that is used only to identify a product, device or instrument sold or *used in the performance of a service* rather than to identify the service itself does not function as a service mark."  *Id*. § 1301.02(a) (emphasis added).  Stated differently, a service mark does not identify goods.  *Worthington Foods, Inc. v. Kellogg, Co*., 732 F. Supp. 1417, 1429 (S.D. Ohio Mar. 1, 1990) (citing 1 J. McCarthy, Trademarks and Unfair Competition § 4.4, at 128 (2d ed. 1984)).

The fact that NetJets initially argued that the Intellijet software product is a good itself suggests that the INTELLIJET mark is not a service mark.  *See id.*  Even if a jury were to conclude that NetJets did not use the INTELLIJET mark in commerce in connection with the Intellijet product, "the fact that [NetJets] does not sell the [Intellijet] software and may not use [INTELLIJET] in a technical trademark case in connection with the software does not . . . warrant a finding that [INTELLIJET] must therefore function as a service mark."  *In re Walker Research, Inc*., 288 U.S.P.Q. 691, 692 (Trademark Tr. & App. Bd. 1986).  Like the software at issue in *In re Walker*, here, "[t]he clear import of the mark as used . . . is to identify the software or computer program which is used in the performance of the services."  *Id*.  The INTELLIJET mark therefore is not being used to identify NetJets' services within the meaning of § 1127.  *See id*.

### E.  Third Issue: Whether Defendant's Use Of The Mark Created A Likelihood Of Confusion For Private-Plane Companies That May Seek To Buy The Software In The Future

At this point the only remaining claims (of those Defendant challenged in its motion for summary judgment) are NetJets' common law claim for trademark infringement (Count I)

and NetJets' false designation of origin claim pursuant to 15 U.S.C. § 1125 (Count II).  The

issue for the Court with respect to these claims is whether there exists a likelihood of

confusion for future external customers of the Intellijet product.

The parties agree on the eight factors that the Court must consider in determining

whether a likelihood of confusion exists.  These factors, known as the "*Frisch* factors," are:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser case;
7. defendant's intent in selecting the mark;
8. likelihood of expansion of the product lines.

*Frisch's Rest., Inc. v. Shoney's Inc*., 759 F.2d 1261, 1264 (6th Cir. 1985).  These factors

"imply no mathematical precision, but are simply a guide to help determine whether

confusion is likely." *Homeowners Grp. v. Home Mktg. Specialists, Inc*., 931 F.2d 1100, 1107

(6th Cir. 1991).  "The ultimate question remains whether relevant consumers are likely to

believe that the products or services offered by the parties are affiliated in some way."  *Id.*

Whether there exists a likelihood of confusion "is a mixed question of fact and law."

*Champions Golf Club, Inc. v. The Champions Golf Club, Inc*., 78 F.3d 1111, 1116 (6th Cir.

1996).  The Court's analysis of each factor involves questions of fact, but the analysis of

whether those "foundational facts" constitute a likelihood of confusion is a question of law.

*See id.*

**1. Strength of the Mark, Marketing Channels Used, Evidence of Actual Confusion, Likely Degree of Purchaser Case, Likelihood of Expanding the Product Lines**

"The strength of a mark is a factual determination of the mark's distinctiveness." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*., 502 F.3d 504, 515 (6th Cir. 2007) (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 280 (6th Cir. 1997)). "A stronger mark is accorded greater protection and encroachment upon a strong mark is deemed more likely to produce confusion among buyers." *Id*. (quoting *Champions Golf Club, Inc*., 78 F.3d at 1116). "A term for which trademark protection is claimed will fit somewhere in [a] spectrum which ranges through (1) generic or common descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful." *Champions Golf Club, Inc*., 78 F.3d at 1116–1117 (quoting *Induct–O–Matic Corp. v. Inductotherm Corp*., 747 F.2d 358, 362 (6th Cir. 1984)). In addition to the "conceptual strength" of the mark's distinctiveness, the Court must also consider the mark's "commercial strength" or "the marketplace recognition value of the mark." *Maker's Mark Distillery v. Diageo N. Am*., 679 F.3d 410, 419 (6th Cir. 2012).

Related to the concept of commercial strength is the fifth *Frisch* factor: marketing channels used. "This factor . . . consists of considerations of how and to whom the respective goods or services of the parties are sold." *Champions Gold Club, Inc*., 78 F.3d at 1120 (quoting *Homeowners Grp., Inc.*, 931 F.2d at 1110). The Court must examine whether the parties have overlapping markets such that relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

 Once the relevant market and potential purchasers are identified, the Court must determine how sophisticated those purchasers are likely to be. "[W]hen services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases . . . [with] such buyers, other things being equal, there is less likelihood of confusion." *Id*.

Evidence of actual confusion is not necessary to prove likelihood of confusion, but, if it exists, it is relevant to a determination that there exists a future likelihood of confusion in the marketplace.  *See, e.g., id*.

Here, the INTELLIJET mark is suggestive because it "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods."  *Id*. at 1117.  In other words, the mark suggests that the software is intelligent while playing on the aviation term "jet."  Given the closeness between the terms "INTELLIJET" and "intelligent," however, the Court agrees with Defendant that the mark is on the weaker end of the spectrum for suggestive marks.

The Court also agrees with Defendant that, given the fact that the analysis in this case is limited to future sales to other private-plane companies, the INTELLIJET mark is not commercially strong.  There are only two potential leases to external customers (Marquis and NAS) at issue in the mark's twenty-plus year existence.  NetJets did not provide any evidence about advertising efforts to other such external customers.  There simply is no indication that NetJets intends to license the software to other external customers or intends for other external customers to recognize the software by its name.  The mark, therefore, is commercially weak.

The lack of marketing efforts to future external customers or lessees *of the software* (rather than of NetJets' services) further supports Defendant's position.  NetJets does not attempt to explain the marketing channels it uses for future external customers of the software similar to Marquis and NAS.  To the contrary, NetJets asserts that it advertises the software in connection with its fractional-ownership services, which is irrelevant to the limited question

25

of whether "private-plane companies that may seek to buy the software in the future," (ECF No. 92, at PAGEID # 4920), are likely to overlap with the markets Defendant targets.  NetJets similarly does not attempt to argue that it intends to expand the Intellijet software product line to other products in which private-plane companies would be interested.  Given these facts, it is not surprising that there is no evidence of actual confusion between such private-plane companies and Defendant's customers.

Because there is no indication that any private-plane companies will seek to purchase or lease the Intellijet software in the future, the Court cannot make any factual determination about the likely degree of sophistication of those purchasers.  The Court notes, however, that the Technical Services Agreement with NAS that the Sixth Circuit referenced is a twenty-two page license between sophisticated commercial entities.  *See* ECF No. 64-6, at PAGEID # 3406–3427.  Confusion about the source of the Intellijet product was unlikely in that instance.

### *2. Relatedness of the Goods, Similarity of Marks, Intent*

Courts considering the "relatedness of the goods" factor consider three scenarios:

(1) cases in which the services of the parties are in direct competition, 'in which case confusion is likely if the marks are sufficiently similar'; (2) cases in which the 'services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors'; and (3) cases in which the "services are totally unrelated, in which case confusion is unlikely.'

*Champions Golf Club, Inc*., 78 F.3d at 1118.  Products and/or services are " 'related' not because they coexist in the same broad industry, but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Grp., Inc*., 931 F.2d at 1109.

26

This case falls into the middle category in which the Intellijet software product and Defendant's aircraft brokerage services are related but are not directly competitive. If the dispute were about NetJets' business as a whole, then the Court would agree that Defendant's recently-filed application indicating an intent to use its name in connection with "aircraft management services" and "aircraft chartering; leasing of aircraft" would put the parties in direct competition. But the dispute is not about NetJets' business as a whole. As the Court has consistently noted throughout this Opinion and Order, the dispute in this case is limited to potential instances in which NetJets sold and/or leased (or plans to do so in the future) its software to external customers. The product at issue is the software product. NetJets' argument that it "use[s] the INTELLIJET mark not only to identify the Intellijet software, but also to distinguish NetJets' suite of private jet aviation services," (ECF No. 102-1, at PAGEID # 5362), ignores this point entirely. The rest of NetJets' arguments on this point suffer from this same defect.

The result of this conclusion is that the likelihood of confusion analysis turns on factors other than the relatedness of the goods. *See Champions Golf Club, Inc*., 78 F.3d at 1118. The Court finds that, given its conclusions above with respect to market share and commercial strength, the remaining *Frisch* factors (similarly of the marks and Defendant's intent) do not impact the ultimate conclusion in this case. Even if the marks are used identically, and even if Defendant began using the mark with knowledge of the Intellijet software, there simply is no indication that future private-plane customers seeking to purchase the Intellijet software would be confused about the source of that product. None of the evidence NetJets cites is relevant to this limited issue. As such, there exist no disputed issues

of fact, and there exists no likelihood of confusion between the marks as a matter of law. Summary judgment on Counts I and II is proper.

### F.  Remaining Claims

Defendant's initial motion for summary judgment did not address Counts III, IV, and V of NetJets' complaint (for deceptive trade practices under Ohio law, unfair competition under Ohio law, and injunctive relief, respectively) or Count II of its counterclaim (for unfair competition).  Defendant indicated that it no longer seeks to pursue Count II of its counterclaim.  (ECF No. 87.)  Defendant also moves for summary judgment on Counts III and IV of NetJets' complaint on the ground that the analysis is the same under Ohio law as it is under federal law.  NetJets did not respond to those arguments.  The Court finds that summary judgment on these Counts is proper.  The Court similarly finds that NetJets' claim for injunctive relief is moot in light of the conclusions reached above.

### III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment on all of NetJets' claims and on Defendant's counterclaim.  (ECF Nos. 51 & 97.) The Clerk is **DIRECTED** to enter judgment accordingly and terminate this case from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED.**

/s/ Gregory L. Frost
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**